UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | * |
| v. | * |
| | *   Criminal Action No. 16-30020-MGM-2 |
| JAMIL ROMAN, | * |
| | * |
| Defendant. | * |

MEMORANDUM AND ORDER REGARDING
MOTION TO SUPPRESS
(Dkt. No. 126)

April 18, 2018

MASTROIANNI, U.S.D.J.

I. INTRODUCTION

In applying for a warrant to search the business and residence of Jamil Roman ("Defendant"), the Government alleged in an affidavit that a confidential informant ("CS") obtained four kilograms of cocaine at Defendant's business, TWC Auto Body, located at 56 Jackson Street, Holyoke, Massachusetts. However, CS—upon agreeing to cooperate with federal law enforcement—affirmed in a written statement that the cocaine was actually delivered to CS's business, located at 712 Boston Road, Springfield, Massachusetts. In light of this discrepancy, concerning the only allegation in the search warrant affidavit providing a sufficient nexus between the alleged criminal activity and Defendant's business address, this court previously held that Defendant satisfied his burden, under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), to obtain an evidentiary hearing. *See United States v. Roman*, 2017 WL 4517963 (D. Mass. Oct. 10, 2017).

Following the *Franks* hearing—which occurred on multiple days spread out between November of 2017 and January of 2018—the court will grant Defendant's motion to suppress as to

the search of his business. The court finds the Government[1] committed a series of easily avoidable errors which, combined with the admittedly high risk of the harm that occurred here, amounted to reckless disregard for the truth. In addition, the court finds that the "reformed" affidavit fails to establish probable cause to search Defendant's business. As a result, the warrant to search Defendant's business "must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.[2]

II. FINDINGS OF FACT

In 2013 and early 2014, DEA Special Agent John McGrath and Robert Alberti (then an Easthampton police officer temporarily assigned to the DEA Task Force) assisted the FBI Gang Task Force in an investigation targeting CS. The DEA Task Force's focus was on identifying the supply sources of narcotics coming into western Massachusetts from outside the region. In contrast, the FBI Gang Task Force focused on street level gang activity (albeit often related to narcotics).

On January 14, 2014, the FBI Gang Task Force prepared to execute search warrants for CS's residence and business. At around the same time, McGrath and Alberti conducted surveillance on CS near Western New England University, where CS was pulled over by Springfield police officers at the behest of the FBI Gang Task Force. CS agreed to cooperate with law enforcement and informed agents that he had three kilograms of cocaine at his business on 712 Boston Road, Springfield, Massachusetts. CS also stated that the cocaine ultimately came from Javier Gonzalez but that CS actually obtained the narcotics from Defendant.

After FBI agents secured the cocaine from CS's business, CS provided a detailed statement at the FBI office. McGrath and Alberti as well as agents from the FBI Gang Task Force were present during CS's statement. Alberti used an FBI laptop computer to transcribe CS's statement into a typed document. CS explained early in the interview that he "got these 4 kilos a few days ago

---

[1] For reasons discussed below, the court considers not just the conduct of the affiant, but the actions and inactions of other government agents intimately involved in the investigation.

[2] As previously explained, Defendant's challenge to the search of his residence will be addressed separately.

from Javier Gonzalez. Javier had [Defendant] drop the kilos off to me around 712 Boston Road." (Ex. 2 ¶ 5.)[3] Although Alberti testified he could not recall CS making this statement and expressed doubts as to its accuracy, both Alberti and McGrath witnessed CS read and initial each paragraph as well as certify under penalty of perjury that CS had an opportunity to make corrections and that the statement was accurate. Moreover, although CS appeared nervous during the course of his interview, he acted calm and lucid while reading and initialing the written statement.[4]

During his typing of the statement, Alberti struggled at times keeping up with CS's responses because of significant disorganization in the multi-agent questioning process. Agents asked questions rapidly and seemingly in random fashion, with the FBI agents focused on gang-related information and the DEA agents focused more on the source of the cocaine. In response, CS provided a broad range of information dating back to 2000 and involving numerous individuals and organizations. Alberti attempted to draft the statement in chronological order and so had "to go back and forth in the statement" when typing to keep it organized. (Dkt. No. 153, Tr. of Ev. Hr'g Dec. 15, 2017, at 23.) Moreover, at least one agent repeatedly entered and exited the room during the interview, further contributing to the chaotic atmosphere. After the interview, the FBI maintained CS's written statement, despite "handing off" CS to the DEA Task Force as a cooperating informant. Neither Alberti nor McGrath obtained or requested a copy of the statement, and it was not entered into the DEA electronic filing system.

Following CS's decision to cooperate, the joint investigation of the FBI and DEA continued to diverge. The DEA Task Force, which previously operated in a supporting role in the investigation of CS, began investigating international drug trafficking by Gonzalez.[5] Approximately one week after CS gave his written statement, DEA Special Agent Scott Smith joined Alberti and McGrath in

---

[3] As noted, agents seized only three kilograms of cocaine from CS's business, but CS explained that one of the four kilograms was "still on the street" as he had sold the cocaine to another individual who owed CS money for it. (Ex. 2 ¶ 4.)

[4] Although Alberti testified Spanish may have been CS's first language, CS also spoke English and language was not a barrier during the interview.

[5] The FBI Gang Task Force, on the other hand, focused on the information CS provided regarding local gang activity.

3

the Gonzalez investigation. Smith would eventually draft the affidavit in support of the warrant to search Defendant's Holyoke business (among other locations). Crucially, however, Alberti and McGrath did not inform Smith about the existence of CS's written statement or its content (specifically, that CS received the kilograms of cocaine at 712 Boston Road in Springfield). In addition, no DEA reports reference CS's written statement.[6] For example, McGrath wrote three DEA Form-6 Reports ("DEA-6s") between January 21, 2014 and January 28, 2014 (an Initial Debriefing Report, a Case Initiation Report, and another Debriefing Report), and none mention CS's January 14th written statement. (Exs. 6-8.) Moreover, none of the DEA reports state that CS received the kilograms of cocaine at CS's business in Springfield.[7]

The failure to apprise Smith of the existence of CS's written statement or the fact that CS reported having received the kilograms in Springfield, either orally or through a DEA report (or via the written statement itself), was a serious error, as McGrath, Alberti, and Smith each acknowledged in their testimony. Smith testified that when he is assigned to an investigation already underway, he first speaks with the agents previously assigned to the investigation and then reads the reports in DEA's electronic case file. The electronic case file, Smith explained, is meant to encapsulate all the documents written regarding the investigation. Thus, Smith testified, it was important to maintain a complete and accurate case file because agents rely on the information at later points in the investigation—for example, when applying for search warrants or testifying in court—and could be misled by any omissions. Moreover, Smith explained that it was particularly important for the case file to include a report reflecting the location of a drug transaction between a confidential informant

---

[6] There was, however, an FBI report filed in the "attachment tab" of the DEA electronic case file on February 4, 2014, which referenced CS's written statement. Smith testified that he only learned of the existence of this document on the first day of the *Franks* hearing. He further testified that he typically did not review documents filed in the attachment tab because the documents found there were usually insignificant, administrative items. Moreover, Smith explained that by February 4, 2014, when this FBI report was added to the DEA electronic case file, he would not have examined the file again because he had already done so when he was first assigned to the investigation and he did not continuously review the file. Smith testified that if he had been aware of this FBI report, he would have sought to obtain a copy of CS's written statement.

[7] Nor did any DEA report state that CS obtained the kilograms of cocaine at *Defendant's* Holyoke business. In fact, there is no mention whatsoever in any DEA report of Defendant's business being a location of past known drug-dealing activity, despite some testimony suggesting that to be the case.

4

and a target. Smith further testified that if he had been aware of the written statement provided by CS, he would have read it, included it in the case file, and divulged its existence in the search warrant affidavit.

Alberti and McGrath echoed Smith's concerns. Alberti testified that the location where an individual obtained narcotics is important, and such information should be accurately summarized and placed in the file so someone in Smith's position would be able to rely on the file to obtain accurate information. McGrath acknowledged that CS's written statement (or any confidential informant's signed statement) is an important piece of evidence and anyone looking at the electronic case file would not have been aware that CS gave a written statement. McGrath also testified it was his responsibility to ensure the case file was accurate, he was aware other agents may have to rely on DEA-6s in the file in the future, and he should have maintained an accurate case file to alert Smith to the existence of CS's statement that he received the cocaine in Springfield.

The DEA Task Force, armed with the assistance of CS, conducted its investigation of Gonzalez between January and March of 2014. During that time, McGrath, Alberti, and Smith met with CS regularly and used him to surveil Gonzalez and Defendant. At CS's meetings with Gonzalez and Defendant, most of which were recorded, there was no mention of TWC Auto Body in Holyoke as the location of the four kilogram cocaine transaction between CS and Defendant (or any other drug transaction), even though CS was never instructed by the DEA Task Force not to discuss it.

Smith began drafting the search warrant affidavit in early March of 2014. Both McGrath and Alberti reviewed the affidavit for its content prior to its submission. Of central importance to the *Franks* issue, the affidavit at paragraph 54 alleged: "As previously stated, [CS] relayed that [TWC Auto Body, on 56 Jackson Street in Holyoke, Massachusetts] is the location where he would obtain kilogram quantities of cocaine from the Gonzalez Organization to include the three kilograms which were seized from [CS] in January of 2014." (Ex. 1 ¶ 54.) At the *Franks* hearing, Smith could not identify the source of this information. Smith testified that although he thought this information

5

came from CS, McGrath, or Alberti, he could not recall where he heard the information and had no specific recollection of CS telling him this.

Alberti and McGrath, for their part, provided inconsistent testimony regarding the source of this information. In attempting to explain why he did not inform Smith about CS's written statement, Alberti stated that "[t]he 712 Boston Road portion of that statement . . . did not resonate with me," and "[a]s the investigation continued, CS would tell us that he got those kilos from TWC." (Dkt. No. 153, Tr. of Ev. Hr'g Dec. 15, 2017, at 42.) However, on cross examination, Alberti conceded that CS did not tell Alberti directly that he received the cocaine at TWC Auto Body. McGrath first testified he could not recall CS stating that CS and another individual, Donald Duarte,[8] visited TWC Auto Body in the days leading up to January 14, 2014. Later, however, McGrath testified he did believe CS provided that information during one of their meetings. In addition, as previously noted, no DEA-6s reported that CS stated he received cocaine at TWC Auto Body in Holyoke.

Apart from the specific four kilogram transaction referenced in the affidavit, the Government witnesses also provided vague testimony regarding their prior knowledge of TWC Auto Body and Defendant. Alberti testified on direct examination that he "was familiar with [Defendant] and his place of business on Jackson Street in Holyoke as a location that narcotics are distributed and sold from." (Dkt. No. 153, Tr. of Ev. Hr'g Dec. 15, 2017, at 17.) However, when asked on cross examination the basis for that statement, Alberti testified it was only his "general understanding of that address" and he had never witnessed narcotics being distributed from TWC Auto Body. (*Id.* at 56.) Alberti and McGrath both testified they observed CS in the parking lot of

---

[8] In a supplemental filing made prior to the *Franks* hearing, the Government pointed to CS's March 3, 2016 Grand Jury testimony, during which CS stated he received the four kilograms at TWC Auto Body on January 13, 2014, while accompanied by Donald Duarte. The Government argued that this testimony supported the accuracy of the search warrant affidavit's assertion that CS received the cocaine at Defendant's business (despite the Government previously conceding that the affidavit was false in this respect). At the *Franks* hearing, however, the Grand Jury testimony was never introduced into evidence and only referenced during testimony once (prompted by Defendant's counsel on cross examination). In any event, the court finds the Grand Jury testimony largely irrelevant, as it post-dates the search warrant affidavit by approximately two years and therefore was not available when the affidavit was submitted. Moreover, even if the court were to consider the Grand Jury testimony, it would not alter the court's finding, discussed below, that CS received the four kilograms of cocaine at CS's business in Springfield.

TWC Auto Body on one occasion, prior to CS cooperating with the Government. But neither wrote a report memorializing the event, and McGrath testified they never saw CS outside of his vehicle. In addition, Smith testified that when he drafted the affidavit, he had not learned CS and Defendant were ever seen meeting together and could not recall being aware that CS had been observed at TWC Auto Body prior to the recorded meetings.

In a separate portion of the search warrant affidavit, Smith wrote that, at a March 13, 2014 recorded meeting at Gonzalez's business, Defendant stated "they were currently 'dry.'" (Ex. 1 ¶ 38.) Smith then wrote in the affidavit: "I am aware that drug trafficker[s] often use the term 'dry' to mean that they do not currently have a supply of drug." (*Id.*) At the March 13, 2014 meeting, however, Defendant actually stated: "There is nothing around brother, nothing." (Ex. 5 at 12.) Although the transcript of the recorded meeting was not available when Smith wrote the affidavit, he did have access to the recording itself. Smith testified that the language quoted in the affidavit was equivalent to the actual words spoken by Defendant at the recorded meeting, based on Smith's training and experience, but the affidavit does not reflect that the word "dry" was merely an opinionated interpretation of the actual language used.

Despite applying for six separate search warrants targeting three individuals (Defendant, Gonzalez, and David Dulchinos), the Government used the same affidavit authored by Smith in support of them all. The decision to use only one affidavit was made by the Assistant United States Attorney overseeing the investigation. On March 21, 2014, United States Magistrate Judge Kenneth Neiman authorized the search warrants, and on March 25, 2014, the warrant to search TWC Auto Body was executed.

### III. PROCEDURAL HISTORY

Defendant filed a motion to suppress, arguing, among other things, that he was entitled to a *Franks* hearing in light CS's written statement. In response to this argument, the Government did not dispute the inaccuracy of the statement in the affidavit that the three kilograms of cocaine, seized from CS on January 14, 2014, were obtained at TWC Auto Body in Holyoke. In fact, the

Government conceded that statement was false at the motion hearing and argued the court should excise the phrase "to include the three kilograms which were seized from [CS] in January of 2014" when reviewing the affidavit. The Government did not, however, concede intentional or reckless conduct. The Government also asserted the remainder of the affidavit, in particular, the non-excised portion of paragraph 54—"[a]s previously stated, [CS] relayed that [TWC Auto Body] is the location where he would obtain kilogram quantities of cocaine from the Gonzalez Organization"—provided probable cause to search TWC Auto Body. On October 10, 2017, the court concluded that Defendant met his burden to obtain a *Franks* hearing, based on (a) the contradiction between paragraph 54 of the search warrant affidavit and CS's written statement, and (b) the importance of paragraph 54 to the probable cause determination. *Roman*, 2017 WL 4517963, at *2-4. The court also explained that the "[a]s previously stated" portion of paragraph 54 was false because the affidavit made no other reference to TWC Auto Body being the location where CS obtained drugs. *Id.* at *2. Moreover, the court explained that even if it treated the language in paragraph 54 preceding "to include the three kilograms" as an independent allegation that CS received drugs at TWC Auto Body, "the bare assertion that [CS] 'would obtain' drugs from Defendant's business, without any additional detail or factual support," was too conclusory or generalized "to provide 'a substantial basis for determining the existence of probable cause.'" *Id.* at *3 (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).

Therefore, despite the Government's initial concession regarding the falsity of one portion of paragraph 54, a *Franks* hearing was necessary due to legitimate questions regarding the accuracy of the entirety of paragraph 54, to determine intentionality or recklessness, and because of the court's conclusion that the false statements would be necessary to a finding of probable cause.[9] *See id.* at *2-4. Shortly before the *Franks* hearing, moreover, the Government backed off its concession, without clearly withdrawing it, and argued the phrase "to include the three kilograms which were

---

[9] The court notes that this is not a case in which the Government agreed to excise the *entire* paragraph at issue, thereby arguably eliminating the necessity for a *Franks* hearing and permitting the court to proceed straight to a four-corners analysis of the excised affidavit.

8

seized from [CS] in January of 2014" was, in fact, true and CS's written statement (regarding the location of the four kilogram drug transaction) was false. This raises a question as to whether the Government had waived such an argument. Defendant, however, never pressed the point of a Government waiver, thus "waiv[ing] [his] waiver argument." *Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc.*, 812 F.3d 213, 233 n.32 (1st Cir. 2016). Accordingly, in addition to the question of recklessness, the court also considers the Government's belated assertion as to the accuracy of paragraph 54 on the merits.

## IV. STANDARD

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called 'nexus' element." *United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015) (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999)). "Under *Franks*, 438 U.S. at 155, a defendant may request an evidentiary hearing to challenge the truthfulness of statements made by law enforcement agents in a search warrant affidavit." *United States v. Hicks*, 575 F.3d 130, 138 (1st Cir. 2009). "If a defendant, by a preponderance of the evidence, shows at a *Franks* hearing that an affidavit in a warrant application contains false statements or omissions, made intentionally or with reckless disregard for the truth, and that a finding of probable cause would not have been made without those false statements or omissions, then the defendant is entitled to the suppression of evidence obtained under that warrant." *United States v. Arias*, 848 F.3d 504, 510-11 (1st Cir. 2017). "Recklessness may be inferred from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Id.* at 511 (quoting *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002)). Moreover, "[i]n the case of allegedly material omissions, recklessness may be inferred where the omitted information was critical to the probable cause determination." *United States v. Gifford*, 727 F.3d 92, 98-99 (1st Cir. 2013) (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 81-82 (1st Cir. 2005)). A mere showing of "negligence or innocent mistake," however, is "insufficient" under *Franks* to obtain

suppression. *United States v. Tzannos*, 460 F.3d 128, 138 (1st Cir. 2006) (quoting *Franks*, 438 U.S. at 171).

V. ANALYSIS

As an initial matter, the court first must determine whether its analysis of intentional or reckless conduct is confined only to the affiant or whether it may include other government agents as well. Commendably, the Government conceded on the first day of the *Franks* hearing that the court should consider whether the investigation as a whole was reckless. That concession, in the court's view, was substantively correct. The vast majority of courts recognize the *Franks* inquiry should not focus solely on the affiant, because "a different rule would permit government officials deliberately to keep from affiants or the court information material to the determination of probable cause and by such conduct avoid the necessity of a *Franks* hearing." *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992); *see also United States v. Garcia-Zambrano*, 530 F.3d 1249, 1258 n.6 (10th Cir. 2008); *United States v. Lakoskey*, 462 F.3d 965, 978 (8th Cir. 2006); *United States v. Whitley*, 249 F.3d 641, 621 (7th Cir. 2001); *United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir. 1995); *United States v. Calisto*, 838 F.2d 711, 714 (3d Cir. 1988). The First Circuit, for its part, has suggested that *Franks* should not be "read to apply only to misrepresentations made *by the affiant himself*, because such a reading would allow the police to slip lies into affidavits with impunity by simply passing them through an officer ignorant of their falsehood." *United States v. D'Andrea*, 648 F.3d 1, 13 (1st Cir. 2011); *cf. United States v. Tanguay*, 787 F.3d 44, 52-53 (1st Cir. 2015) (explaining that the district court's "rejection of the appellant's claim rested on the erroneous assumption that a *Franks* violation could not arise out of a failure to include in a warrant affidavit facts not actually known to the affiant"). Moreover, in *Franks* itself, the Supreme Court explained that "police could not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *Franks*, 438 U.S. at 163 n.6. This case fits comfortably within that doctrine. While the affiant here, Smith, had no personal knowledge of CS's written statement, broadening the picture to include the conduct of both Alberti and McGrath raises a legitimate question as to whether the

investigation as a whole recklessly omitted or misrepresented information regarding the location of the four kilogram drug transaction.

Before deciding that question, however, the court deems it necessary to make a subsidiary factual finding as to the accuracy of the assertion, in CS's written statement, regarding CS receiving the kilograms of cocaine at his business on 712 Boston Road, Springfield. The court finds, for purposes of the *Franks* inquiry, that this statement was indeed accurate. CS's interview at the FBI office on January 14, 2014 occurred within days of the drug transaction, so the details of that event were fresh in CS's mind. In addition, the statement that CS received the cocaine in Springfield was made at the beginning of the interview, before the interview dissolved organizationally into an undisciplined exchange of wide-ranging information. Although testimony indicated CS was upset during the interview, at its close he read the entire written statement and had the opportunity to correct it, during which time he was calm and appeared to understand its substance. Furthermore, CS initialed each paragraph and certified under penalty of perjury that he "fully underst[ood]" the statement; that it was "true and correct"; and that he made the "statement freely and voluntarily without any threats or rewards, or promises of reward having been made to [him] in return for it." (Ex. 3 at 9.) While Alberti testified he doubted the accuracy of the 712 Boston Road statement and speculated it may have been a typographical error due to his confusing the addresses for CS's and Defendant's businesses, CS's initialing of that paragraph undermines Alberti's contention.[10] The content of the statement also belies Alberti's typographical error suggestion. The actual statement explains: "Javier had [Defendant] drop the kilos off to me around 712 Boston Road." (Ex. 3 ¶ 5.) It is fair to infer that CS would not have stated that Defendant "drop[ped] the kilos off" to CS if that exchange was really at Defendant's own business—such a situation would not be a drop off by Defendant but, rather, a pick-up by CS.

---

[10] McGrath, who was also present for CS's interview at the FBI office, appeared to voice no doubt about the accuracy of this statement, having testified that he was aware, after reviewing CS's written statement, that CS originally did say Defendant delivered the four kilograms to CS at 712 Boston Road.

11

The court also finds paragraph 54 of the search warrant affidavit is false—not only as to the reference to the four kilogram drug transaction (which is completely contradicted by CS's written statement), but also as to the statement that CS "would obtain kilogram quantities of cocaine" at TWC Auto Body. No DEA reports indicate that CS made either statement, and no witnesses testified CS ever stated he had received cocaine at TWC Auto Body. The closest testimony on this point was Alberti's statement of a prior "general understanding," without any detail of the time frame or circumstances of his reaching such a "general understanding," that TWC Auto Body was known for drug dealing and McGrath's inconsistent testimony that CS stated he went to TWC Auto Body with Donald Duarte days before January 14, 2014. In addition, both testified they observed CS in the parking lot of TWC Auto Body prior to CS cooperating. None of this evidence, however, corroborates paragraph 54 of the search warrant affidavit, which states: "[CS] *relayed* that [TWC Auto Body] is the location where he would obtain kilogram quantities of cocaine from the Gonzalez Organization to include the three kilograms which were seized from [CS] in January of 2014." (Ex. 1 ¶ 54 (emphasis added).)

In light of these findings, the affidavit involves *both* two misrepresentations (the false statements attributed to CS) and an omission (the failure to divulge CS's January 14, 2014 written statement). The court next must decide whether these missteps were made with reckless disregard for the truth. "[T]he Supreme Court in *Franks* gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that 'negligence or innocent mistake [is] insufficient.'" *Tanguay*, 787 F.3d at 52 (quoting *United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979)). Although the First Circuit has provided some additional clarification— for example, explaining that "[r]ecklessness may be inferred from circumstances evincing obvious reasons to doubt the veracity of the allegations," *Arias*, 848 F.3d at 511 (quoting *Ranney*, 298 F.3d at 78)—these statements on their own remain somewhat vague. Recklessness and negligence, though, are established legal concepts outside of the *Franks* context. Therefore, in addition to the binding language set forth in *Franks* and its progeny, the court can also look to related case law for guidance.

The court finds Defendant has carried his burden, by a preponderance of the evidence, of demonstrating recklessness. McGrath, Alberti, and (to a lesser extent) Smith committed a number of easily preventable errors—any one of which, on its own, may have only constituted negligence. However, the court finds that the cumulative effect of these errors—especially considering the acknowledged risks of harm flowing therefrom—amounts to recklessness under these circumstances. These errors include, among others: the failure to retain or obtain a copy of CS's January 14, 2014 written statement for inclusion in the DEA case file, despite the fact that Alberti typed the statement in McGrath's presence; the failure to inform Smith of CS's written statement and/or its content—specifically, that CS received the kilograms of cocaine (the seizure of which triggered the Gonzalez investigation) at 712 Boston Road in Springfield; the failure to reference CS's written statement in any DEA report; and the failure of McGrath and Alberti when reviewing the affidavit to alert to (a) the lack of reference to CS's written statement (or its content) or (b) the contradictory statement that the four kilogram drug transaction occurred at TWC Auto Body.[11] There were also a number of less egregious errors which, although not determinative, support an inference that the investigation acted with reckless disregard for the truth in general. For example, in the affidavit Smith falsely quoted Defendant as using the word "dry" during a recorded meeting and then highlighted the importance of this misquoted word in the next sentence. Smith (along with McGrath and Alberti) failed to notice and follow up on an FBI report, added to the attachment tab in the DEA case file on February 4, 2014, which made reference to CS's written statement. The DEA agents also failed to document the information CS provided while cooperating as well as their prior surveillance of CS, TWC Auto Body, and Defendant. Moreover, the decision by the Government to forgo specificity by using a single affidavit to apply for warrants at different

---

[11] In addition, Smith alleged in the affidavit that the information therein was based on his "personal knowledge and information provided to me by other federal, state and local law enforcement officers," (Ex. 1 ¶ 7), despite testifying that he could not identify the source of the information set forth in paragraph 54. The court finds many of the representations in the affidavit were not based on actual personal knowledge or knowledge that could be meaningfully attributed to, or considered as shared by, other officers.

locations is inconsistent with the level of care and attention the probable cause standard should generate.

In an analogous context, the First Circuit has explained that "[t]he distinction among such categories as 'negligence,' 'reckless or callous indifference,' and 'intentional' conduct can be elusive. According to general tort principles, however, a central distinction among these categories involves the actor's degree of certainty that negative consequences will result from his act or omission." *Germany v. Vance*, 868 F.2d 9, 18 n.10 (1st Cir. 1989). In this case, the court finds the Government witnesses generally credible; they testified with impressive candor in a forthright way demonstrating respect for the integrity of the judicial process. However, their own testimony also demonstrates their understanding of the high risk of harm associated with the key errors committed here. Each witness acknowledged that a confidential informant's written statement regarding the location of a drug transaction with a target is a vital piece of evidence and, as such, it is particularly important to maintain or at least accurately summarize it in the case file so other agents would be aware of it. The dysfunctional engagement of FBI and DEA, following CS's decision to cooperate, is gleaned by the court to have been obviously recognized by the agents—as evidenced through their testimony.

As for the proposition that a series of negligent mistakes can add up to recklessness, this concept has been recognized in variety of analogous situations. For example, courts have held that a series of negligent acts or omissions may constitute recklessness or willful misconduct under the Clean Water Act, *see In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657, 742-43 (E.D. La. 2014), the Oil Pollution Act, *see Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 229-30 (D.D.C. 2007), and the Warsaw Convention, *see In re Air Crash Disaster*, 86 F.3d 498, 545-46 (6th Cir. 1996). As the Sixth Circuit explained:

> We do not agree with Northwest that the jury should have been prohibited from viewing the airline's individual mistakes together as a "series of actions or inactions" exhibiting reckless disregard for the safety of the passengers. No principle of law or logic requires a jury evaluating willful misconduct to focus exclusively on discrete acts, without regard for the complete chain of events leading to the accident.

*In re Air Crash Disaster*, 86 F.3d at 545; *see also In re Tug OCEAN PRINCE*, 584 F.2d 1151, 1164 (2d Cir. 1978) ("It is, rather, the combination of factors which together indicate a probable consequence of damage resulting from several failures to act, and by continuing to fail to act in the face of that probability, that indicates a reckless disregard of the consequences. While any one of the faults of Red Star alone, even within privity, may not constitute 'willful misconduct,' on the entire record the various inactions and gross disregard of the potential harm amount, in our opinion, to willful misconduct within the meaning of the statute."); *cf. Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 667 (D.C. Cir. 1996) (explaining that reckless disregard is equivalent to willful misconduct under the Warsaw Convention). Moreover, it is well established in Bankruptcy law that reckless disregard for the truth, which permits a bankruptcy court to deny a discharge under 11 U.S.C. § 727(a)(4) for making false statements, may "be found based on the 'cumulative effect of a series of innocent mistakes.'" *In re McCarthy*, 488 B.R. 814, 826 (B.A.P. 1st Cir. 2013) (quoting *In re MacDonald*, 50 B.R. 255, 259 (Bankr. D. Mass. 1985)). While these cases are by no means exhaustive on the issue, they suffice to demonstrate that the law recognizes recklessness may result from a series of individually negligent acts.

      Granted, the court recognizes the investigation here was somewhat accelerated and the agents were waiting on a particular event—the departure of Gonzalez's tractor trailer for Texas, the timing of which they had no control over—to trigger the execution of the searches. The court, however, finds nothing to support a contention that some type of exigency justified any of the errors described above. In addition, the fact remains that the foundational piece of evidence, typed by Alberti and witnessed by McGrath, which undermined the purported link between Defendant's business and the drug transaction, was omitted from the affidavit. Instead, the affidavit included false information ostensibly providing such a link which no witness could corroborate or adequately explain. These circumstances alone "evinc[e] obvious reasons to doubt the veracity of the allegations" in the paragraph 54 of the affidavit, thus permitting an inference of recklessness. *Arias*,

15

848 F.3d at 511 (quoting *Ranney*, 298 F.3d at 78). Moreover, as explained below, "the omitted information was critical to the probable cause determination." *Gifford*, 727 F.3d at 99 (quoting *Burke*, 405 F.3d at 81-82). Again, this alone permits an inference of recklessness. *Id.* at 98-99. When combined with the court's prior findings of numerous, basic errors resulting in the precise harm which the Government witnesses acknowledged could occur, these circumstances convince the court that the inaccuracies in the affidavit were the result of reckless disregard for the truth.

Having found false statements and an omission made with reckless disregard for the truth, the last step is to determine whether "a finding of probable cause would not have been made without those false statements or omission[]." *Arias*, 848 F.3d at 511. Ordinarily, "a search warrant is reviewed with deference to the issuing magistrate, but allegations of reckless omission 'implicate the very truthfulness, not just the sufficiency, of a warrant application.'" *Gifford*, 727 F.3d at 99 (quoting *Burke*, 405 F.3d at 82). Accordingly, "if such allegations prove to be true, [the court] owe[s] no deference to a magistrate's decision because 'no magistrate will have made a prior probable cause determination based on the correct version of the material facts.'" *Id.* (quoting *Burke*, 405 F.3d at 82). With this principle in mind, the court finds that "with the recklessly omitted information added to the affidavit [and the false statements removed], the reformed affidavit fails to establish probable cause" to search Defendant's business. *Id.* at 98.

The reformed affidavit no longer alleges Defendant provided CS kilograms of cocaine at Defendant's business in Holyoke, but instead alleges that he dropped off the cocaine at *CS's* business in Springfield. Other portions of the affidavit, while alleging Defendant distributes drugs on behalf of Gonzalez and discussed the trafficking operation at meetings with CS and Gonzalez, also fail to provide a connection to Defendant's business. As the court explained in its first *Franks* decision, the affidavit's remaining allegations

> do not create a sufficient link between the criminal activity and Defendant's business. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."). What is missing here is "any factual basis which would indicate that contraband or evidence of alleged criminal

16

behavior would be found at the . . . address." *United States v. Rosario*, 918 F. Supp. 524, 530 (D.R.I. 1996). "[A] suspect's 'status as a drug dealer, standing along, [does not] give[] rise to a fair probability that drugs will be found in his home.'" *Brown*, 828 F.3d [375, 383 (6th Cir. 2016)] (quoting *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005)); *see also United States v. Eng*, 571 F. Supp. 2d 239, 249 (D. Mass. 2008) ("The mere fact, however, that a defendant has dealt in drugs, without more, will not support such an inference, nor will such an inference be drawn merely from the fact that he has conducted a drug transaction at a place near his home."). Instead, there must be "some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence; that is, we have required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Brown*, 828 F.3d at 383; *see also id.* at 384 ("[I]f the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer."). The same is true as to a business address.

*Roman*, 2017 WL 4517963, at *3.[12]

The court recognizes the First Circuit has held, under certain circumstances, that evidence of a suspect's status as "a long-time, successful, drug trafficker" may permit the inference that he is likely to keep drugs and business records in his residence. *Feliz*, 182 F.3d at 87-88. The facts in the affidavit in *Feliz*, however, are a far cry from those at issue here. In *Feliz*, the First Circuit noted that "the affidavit contained substantial, detailed information indicating that Feliz had engaged in illegal drug trafficking for at least twelve years, most recently in the Portland area." *Id.* at 87; *see also United States v. Ribeiro*, 397 F.3d 43, 45-46, 49-51 (1st Cir. 2005) (describing "specific observations about Ribeiro's movements back and forth from his residence in relation to drug transactions"). The allegations in the affidavit here, by contrast, do not contain the same type of particularized information regarding Defendant's past drug dealing, much less allegations of Defendant's status as "a long-time, successful, drug trafficker." *Feliz*, 182 F.3d at 87. In addition, Smith's affidavit alleges

---

[12] The court also previously explained, and reiterates here, that Smith's assertion in the affidavit that evidence of criminal activity is often kept at drug dealers' business and residence is insufficient, especially in light of the "reasons to doubt the affiant's credibility" and accuracy under the circumstances of this case. *Id.* at *4. "To permit a search warrant based solely upon the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect." *Rosario*, 918 F. Supp. at 531; *see United States v. Ribeiro*, 397 F.3d 43, 50-51 (1st Cir. 2005).

17

Defendant dealt drugs on behalf of Gonzalez, who clearly occupied the main focus of the affidavit.[13] Therefore, any inference that could permissibly be drawn from a suspect's status as a drug dealer regarding the location of evidence is significantly weakened where, as here, it is more likely that such evidence would be found at the residence or business of another individual. *Cf. id.* at 88 ("The affidavit indicated that [the defendant] resided in apartment # 1006 at 401 Cumberland Avenue. No other residence or drug-dealing headquarters of his was identified in the affidavit. It followed that a likely place to seek to find incriminating items would be Feliz's residence.").

Moreover, at the *Franks* hearing no witness could provide any real support for the proposition that Defendant was an established drug dealer, despite the affidavit's conclusory allegation that "[a]gents are aware that [Defendant is] a known cocaine trafficker from Holyoke, MA." (Ex. 1 ¶ 16(a).) Alberti merely testified to a "general understanding" of TWC Auto Body as a location of drug dealing activity without any basis or detail. That type of vague and conclusory evidence, however, is plainly insufficient to establish Defendant's status as a long-time drug dealer. *See United States v. Samboy*, 433 F.3d 154, 159 (1st Cir. 2005) ("Probable cause cannot be based on conclusory statements, or mere 'suspicion, rumor, or strong reason to suspect [wrongdoing].'" (quoting *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999)).

The court therefore finds Defendant has proven by a preponderance of the evidence that the affidavit contains false statements and an omission, which were made with reckless disregard for the truth, and that a finding of probable cause would not have been made in the absence of those false statements. The addition of the omitted information further solidifies the lack of probable

---

[13] The court notes that the decision to use a single affidavit in support of multiple search warrants targeting different individuals likely resulted in a lack of attention to the need for particularized facts specific to Defendant. *Cf. United States v. Stearn*, 597 F.3d 540, 562 (3d Cir. 2010) ("Of course, where multiple warrants are support by a single affidavit, an otherwise detailed affidavit may nevertheless be 'bare bones' with respect to some of the warrants sought.").

cause created by the redactions. Even without the addition of the omitted information, however, the affidavit would still fail to provide probable cause due to the redactions alone.

VI. CONCLUSION

For the foregoing reasons, the court ALLOWS Defendant's Motion to Suppress (Dkt. No. 126) in part, to the extent it seeks suppression of the fruits[14] of the search of his business, TWC Auto Body, 56 Jackson Street, Holyoke, Massachusetts.

      /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge

---

[14] Consideration of the search of Defendant's person as fruit of the unlawful search of the business is a question remaining before the court.