UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | Criminal Action No. 16-30020-MGM-2 |
| JAMIL ROMAN, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING
MOTION TO SUPPRESS
(Dkt. No. 126)

August 28, 2018

MASTROIANNI, U.S.D.J.

I. INTRODUCTION

Jamil Roman ("Defendant") filed a motion to suppress the fruits of separate searches of his person, business, and residence. Following a *Franks* hearing, this court granted Defendant's motion as to the search of his business due to material misrepresentations and omissions in the affidavit supporting the warrant (which affidavit also supported the warrant to search Defendant's residence, among others). *United States v. Roman*, 311 F. Supp. 3d 427 (D. Mass. Apr. 18, 2018). Thereafter, the parties presented additional evidence and arguments regarding the searches of Defendant's person and residence. The court now resolves these remaining issues. For the following reasons, the court will deny Defendant's motion as to the search of his person but will grant the motion as to the search of his residence.

## II. Background and Procedural History

The events at issue here arose out of a separate investigation targeting CS, who eventually became a confidential informant for the government. CS, after being pulled over by law enforcement, informed agents that he possessed, at his business, three kilograms of cocaine obtained from Defendant on behalf of Javier Gonzalez, the head of a drug-trafficking organization. Shortly thereafter, CS provided a detailed statement transcribed by Robert Alberti (an officer with the DEA Task Force), in which CS stated that "Javier had [Defendant] drop the kilos off to me around 712 Boston Road," Springfield, Massachusetts, CS's business address.

After approximately two months of investigation into Gonzalez and Defendant (including the recording of their meetings with CS), DEA Special Agent Scott Smith, assisted by Alberti and DEA Special Agent John McGrath, drafted a search warrant affidavit. The affidavit supported six search warrant applications targeting three individuals. As relevant here, one application sought a warrant to search Defendant's business, TWC Auto Body, located at 56 Jackson Street, Holyoke, Massachusetts; another sought a warrant to search Defendant's residence, located at 21 Walsh Street, Chicopee, Massachusetts. Importantly, the affidavit differed from CS's transcribed statement by alleging that the cocaine transaction between Defendant and CS occurred at Defendant's business (TWC Auto Body) in Holyoke, rather than at CS's business in Springfield.[1] On March 21, 2015, United States Magistrate Judge Kenneth Neiman authorized the warrants. On March 25, 2015, the warrants to search Defendant's business and residence were executed. Prior to the execution of the warrant to search TWC Auto Body, FBI Agent Mark Karangekis searched and arrested Defendant at his Holyoke business. The facts surrounding this encounter are described in Section III.A. below.

---

[1] In particular, the affidavit alleged at paragraph 54: "As previously stated, [CS] relayed that [TWC Auto Body] is the location where he would obtain kilogram quantities of cocaine from the Gonzalez Organization to include the three kilograms which were seized from [CS] in January of 2014." (Dkt. No. 131-1 ¶ 54.)

On May 10, 2017, Defendant filed his motion to suppress. Defendant challenged his warrantless search and arrest as well as the existence of probable cause for the warrants to search TWC Auto Body and the residence. In addition, Defendant sought a *Franks* hearing related to the discrepancy between the affidavit and CS's transcribed statement regarding the location of the cocaine transaction. The court held a hearing on Defendant's motion on September 27, 2017, at which it decided to resolve the *Franks* issue before addressing Defendant's other arguments.[2] On October 10, 2017, the court concluded that Defendant met his burden to obtain a *Franks* hearing based not only on the discrepancy regarding the cocaine transaction, but also due to the importance of that allegation in establishing a sufficient connection between criminal activity and TWC Auto Body. *See United States v. Roman*, 2017 WL 4517963 (D. Mass. Oct. 10, 2017).

The court then held the *Franks* hearing—at which Alberti, Smith, and McGrath testified—on multiple days spread out between November of 2017 and January of 2018. On April 18, 2018, the court granted Defendant's motion to suppress as to the search of his business, finding material misrepresentations and omissions in the affidavit, which were made with reckless disregard for the truth, and without which a finding of probable cause would not have been made. *See Roman*, 311 F. Supp. 3d 427. In particular, the court found CS's transcribed statement to be accurate, *i.e.*, that the cocaine transaction between Defendant and CS occurred at CS's business in Springfield, and the affidavit's contrary assertion to be false. *Id.* at 435-36. The court also found the affidavit's further allegation that CS "relayed" he "would obtain kilogram quantities of cocaine" at TWC Auto Body was false, as there was essentially no evidence to support this assertion. *Id.* at 436. Among other errors in the affidavit and investigation as a whole, the court additionally found insufficient support "for the proposition that Defendant was an established drug dealer, despite the affidavit's

---

[2] As the court explained in its first decision, Defendant's "four corners" challenge to the search of the residence "is necessarily affected by the *Franks* issue" and so "must await completion of the *Franks* inquiry." *United States v. Roman*, 2017 WL 4517963, at *1 n.1 (D. Mass. Oct. 10, 2017) (citing *United States v. Fleury*, 842 F.3d 774, 778 (1st Cir. 2016)).

conclusory allegation that '[a]gents are aware that [Defendant is] a known cocaine trafficker from Holyoke, MA.'" *Id.* at 440.

Following the ruling on the *Franks* issue, the court held another evidentiary hearing and the parties submitted supplemental briefing on the remaining suppression issues: the warrantless search of Defendant's person and the search of the residence.[3] The court addresses these issues in turn.

## III. SEARCH OF DEFENDANT'S PERSON AT TWC AUTO BODY

Defendant seeks to suppress the fruits of the search of his person. It is undisputed that neither this search nor Defendant's arrest were authorized by a warrant and that both occurred prior to the full search of TWC Auto Body. Moreover, while the search of TWC Auto Body *was* authorized by a warrant, that warrant has been "voided and the fruits of the search excluded" as a result of the *Franks* hearing. *Roman*, 311 F. Supp. 3d at 429 (quoting *Franks v. Delaware*, 438 U.S. 154, 156 (1978)). Thus, it would appear that to the extent the search warrant provided a lawful basis for law enforcement's presence at the business at the time of Defendant's arrest, this justification is no longer valid in the aftermath of the *Franks* ruling. The court, however, need not resolve this question because the government also contends that TWC Auto Body was open to the public at the time (or at least reasonably appeared to be), providing an alternative lawful basis for law enforcement's presence. The government further argues that probable cause existed to arrest Defendant and he was properly searched incident to his arrest. The court agrees with the government and will therefore deny this portion of Defendant's motion.

---

[3] The government also filed a limited motion for reconsideration of certain factual findings made by the court in the *Franks* ruling. The court addresses this motion in Section IV, regarding the search of Defendant's residence.

A.    Findings of Fact[4]

On March 25, 2014, four days after the issuance of the search warrants, DEA and FBI agents prepared to execute those warrants. FBI Task Force Officer Mark Karangekis conducted surveillance on Javier Gonzalez and eventually stopped the tractor trailer he was driving and arrested him. Karangekis was then instructed to go to TWC Auto Body in Holyoke to secure the business in preparation for the search warrant execution at that address.

Defendant, meanwhile, closed and locked TWC Auto Body at 4:55 p.m., five minutes earlier than the regular 5:00 p.m. closing time posted on the door. However, one of Defendant's customers—Ismael Florez, who needed to drop off a check for parts—called and stated that he was working until 5:30 p.m. that day, so Defendant waited for him. When Flores arrived, Defendant unlocked the door and let him inside.

Karangekis arrived on the scene sometime thereafter, as it was beginning to get dark outside. He opened a door and entered a garage bay to the north of TWC Auto Body in the same building and spoke with individuals who stated they were subleasing that bay from Defendant. Karangekis then proceeded a few bays down to a closed door, the entrance to TWC Auto Body. Upon entering this door, Karangekis did not notice any signs restricting access and, as Defendant had left the door unlocked, he believed it was open to the public. He walked only a couple of feet inside, into a common area of the business, where he saw Defendant meeting with Florez behind a partially partitioned office area. Karangekis asked Defendant to come speak with him, and the two stepped outside, where Karangekis confirmed Defendant's identity, pat frisked him, and found a firearm.[5] Karangekis told Defendant that they had a warrant, which was en route, to search the business. After about ten minutes with Defendant outside, Karangekis called McGrath, who instructed him to

_____
[4] The court finds the following facts based on the evidence presented at the May 30, 2018 evidentiary hearing.
[5] Defendant stated that he had a license to carry the firearm, but Karangekis informed Defendant that agents would hold the weapon while they conducted the search of the business.

arrest Defendant because law enforcement had probable cause to believe he had engaged in drug trafficking. Agents then placed Defendant in handcuffs and searched his person, finding, among other items, two cell phones and $3,000 in cash. Shortly thereafter, agents searched TWC Auto Body pursuant to the warrant which was invalidated as a result of the *Franks* hearing.

B.    Analysis

Before delving into the crux of the matter, the court first makes some preliminary observations in order to properly frame the legal issues for its analysis. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Despite this language, the Supreme Court has held that a warrant is not necessarily required "to make a valid arrest for a felony." *United States v. Watson*, 423 U.S. 411, 417 (1976). "[A]lthough a warrant presumptively is required for a felony arrest in a suspect's home, the Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred." *Florida v. White*, 526 U.S. 559, 565 (1999); *see also Payton v. New York*, 445 U.S. 573, 585-90 (1980). And when an officer has probable cause to arrest, the suspect may permissibly be searched incident to that arrest even if the search occurs prior (but close in time) to the arrest, as long as the fruits of the search were "not necessary to support probable cause to arrest." *Rawlings v. Kentucky*, 448 U.S. 98, 111 & n.6 (1980); *see also United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997) ("[W]hether a formal arrest occurred prior to or followed 'quickly on the heels' of the challenged search does not affect the validity of the search so long as the probable cause existed prior to the search." (quoting *Rawlings*, 448 U.S. at 111)).

Moreover, it is clear that, despite not having the warrant to search TWC Auto Body in hand at the time of his initial intrusion, Karangekis's entry was pursuant to that warrant, which had already been issued and was on its way to the property. *See United States v. Bonner*, 808 F.2d 864, 468-89 (1st Cir. 1986) (rejecting argument that "the evidence seized should have been suppressed because the search warrant was not in the agents' physical possession at the time of entry"); *see also United States v. Cazares-Olivas*, 515 F.3d 726, 730 (7th Cir. 2008) ("[W]hatever the most prudent course may be, the fourth amendment does not require officers to have a warrant in hand when searching."); *United States v. Hepperle*, 810 F.2d 836, 839 (8th Cir. 1987) ("Nothing in the fourth amendment or Rule 41 requires that the search warrant be physically present prior to commencing the search."). Therefore, assuming the invalidation of the TWC Auto Body search warrant vitiates the legality of Karangekis's entry pursuant to that warrant, the question becomes whether TWC Auto Body was sufficiently open to the public at the time such that the entry was lawful regardless. If so, the government has not infringed upon Defendant's "constitutionally protected reasonable expectation of privacy," and thus there was no Fourth Amendment violation, by entering the business. *Oliver v. United States*, 466 U.S. 170, 177 (1984) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).

As intimated, the Supreme Court has recognized an important distinction between the home, a "zone of privacy" entitled to the highest degree of Fourth Amendment protection, on the one hand, and a public place, which enjoys virtually no Fourth Amendment protection, on the other. *Payton*, 445 U.S. at 586-90. *But see Katz*, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not subject to Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." (citations omitted)). While the Supreme Court has explained that "a business establishment or an industrial or commercial facility enjoys certain protections under the Fourth

Amendment," *Dow Chem. Co. v. United States*, 476 U.S. 227 335 (1986), it has also made clear that those portions of a business open to the public, at least during normal business hours, are considered public places involving no reasonable expectation of privacy, *see Maryland v. Macon*, 472 U.S. 463, 469 (1985). As the Court explained in *Macon*:

> Here, respondent did not have any reasonable expectation of privacy in areas of the store where the public was invited to enter and to transact business. . . . The officer's action in entering the bookstore and examining the wares that were intentionally exposed to all who frequent the place of business did not infringe a legitimate expectation of privacy and hence did not constitute a search within the meaning of the Fourth Amendment.

*Id.*; *see also New York v. Burger*, 482 U.S. 691, 700 (1987) ("An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home."). In addition, courts have recognized "that some commercial properties are reasonably accorded a greater level of privacy than others," depending on the nature of the business. *United States v. Bute*, 43 F.3d 531, 536-37 (10th Cir. 1994). For example, "a lesser expectation of privacy likely would attach to the showroom of a car dealership than to a law office where guarded confidential files are kept or a warehouse in which the public is neither invited nor allowed." *Id.* at 537.

This case is not completely aligned with the facts of *Macon* in that TWC Auto Body was not explicitly open to the public during its normal business hours at the time of entry. But the facts here are also materially distinguishable from *United States v. Swart*, 679 F.2d 698 (7th Cir. 1982), perhaps the leading lower court decision on this issue, where the Seventh Circuit held that a warrantless search at an automobile repair shop violated the Fourth Amendment. In *Swart*, following a vehicle fire at the defendant's business, officers suspected the defendant of running an illegal "'chop shop' for the sale of stolen cars." *Id.* at 699. Upon returning to the premises to investigate, officers spoke with an employee who explained that the defendant was not present and declined the officers' request to look around the garage for lack of authority. *Id.* Shortly thereafter, the employee left the business empty and the officers proceeded to search the garage anyways. *Id.* The Seventh Circuit

explained that "the legality of the search [was] contingent on the police having a right to be where they were when they discovered the item." *Id.* at 701. In holding that the defendant had a reasonable expectation of privacy in the searched area, because "the vehicle identification numbers were not exposed to the public for Fourth Amendment purposes," the court rejected the Government's assertion that "the officers could enter the premises based on a general invitation to the public to enter." *Id.* "First," the Seventh Circuit explained, "the officers knew the business was closed." *Id.* "Second, the officers had no reason to believe that the cars were in an area generally open to the public" as "there was no evidence that there were customers near the cars." *Id.* "Third, even if the officers had looked at the cars when the business was open and could reasonably infer that the cars were in an area generally open the public, they were expressly told by Swart's employee that he could not give them permission to look around the premises." *Id.* at 702.[6]

Instead, sitting between the two extremes presented in *Macon* and *Swart* of a business explicitly open to the public during normal business hours and one which is unambiguously closed to the public, the Eighth Circuit's decision in *United States v. Long*, 797 F.3d 558 (8th Cir. 2015), provides the most apt comparison to this case. There, an officer encountered three juveniles with illegal fireworks at 4:20 a.m. *Id.* at 562. Upon questioning, one of the minors "stated that he just bought [the fireworks] down at the OC Store," which was operated by the defendant. *Id.* When the officer arrived at the business, "he was 'unsure' whether it 'was open or closed,'" as "[h]e did not see an open/closed sign nor any posted business hours." *Id.* "An exterior street light in the parking lot and a flood light by the front door were on," and the officer "could hear loud music coming from inside." *Id.* The officer "ultimately concluded the store was open because of the lights, music,

---

[6] The court noted that it "conceivably would be presented with a different situation" "[i]f the officers had started to look around without asking permission," "but presumably [the employee] would have told them to stop the search and they would have lost any authority they had to be in that area." *Id.* Here, Karangekis did enter TWC Auto Body without asking permission first, and there was no evidence that anyone stated access to the business was restricted at that time.

unlocked doors, and the juveniles' report that they had 'just' purchased fireworks there a few minutes before." *Id.* The officer first entered two closed but unlocked doors before knocking and, after no one responded, entering a third unlocked door, where he observed evidence of synthetic marijuana. *Id.* The Eighth Circuit, after noting that "the facts plausibly could support either conclusion," upheld the district court's finding that the store was open to the public when the officer entered and, thus, the defendant "had no reasonable expectation of privacy in the public areas of the OC Store where the evidence was left in plain view." *Id.* at 565-66.

Here, in comparison, Karangekis affirmatively believed that TWC Auto Body was open at the time of his initial intrusion and, arguably, it was in fact open (albeit after normal operating hours).[7] Similar to the discussion with the youth in *Long*, Karangekis spoke with individuals at a neighboring business just prior to his entrance and, unlike in *Swart*, he was never told that he could not access TWC Auto Body. Moreover, in contrast to the Seventh Circuit's assertion in *Swart* that "there was no evidence that there were customers" inside the garage, Defendant in this case was meeting with a customer at the time.[8] Most importantly, perhaps, the door to TWC Auto Body was unlocked. *See Ouimette v. Howard*, 468 F.2d 1363, 1365 (1st Cir. 1972) (holding petitioner had no reasonable expectation of privacy when officers entered an unlocked door to a private club). Although Defendant apparently locked the door at 4:55 p.m., he unlocked it upon the arrival of Florez and neglected to re-lock the door. *Cf. Commonwealth v. Krisco Corp.*, 653 N.E.2d 579, 584 (Mass. 1995) ("[O]ne seeking to protect his or her privacy in a commercial location must take affirmative

---

[7] While Defendant testified that a sign on the outside of the door stated the business was only open until 5:00 p.m., and the court accepts this testimony, Karangekis testified credibly that he did not notice this sign before entering TWC Auto Body.

[8] Although Defendant testified that Florez was a personal friend or acquaintance, Defendant's testimony made clear that Florez visited TWC Auto Body that day and met with Defendant in order to transact business, that is, drop off a check for automobile parts.

steps to bar the public from the area they wish to keep private.").[9] These circumstances—an unlocked door, behind which Defendant was actually conducting business with a customer at the time—significantly strengthen the inference that TWC Auto Body was open to the public. Lastly, the nature of Defendant's business, an auto body shop, reduces the level of privacy which can reasonably be expected, as it is the type of business that society would consider accessible by the public. *See Bute*, 43 F.3d at 536-37.

In the end, the court finds that Defendant has not met his burden of demonstrating a legitimate expectation of privacy in the common area of his business through which Karangekis entered. That is, Defendant has not established "an actual, subjective expectation of privacy," nor "one that society is prepared to recognize as objectively reasonable." *United States v. Rheault*, 561 F.3d 55, 59 (1st Cir. 2009). Just as it would have been reasonable for a prospective customer to enter TWC Auto Body at the time in search of needed car repair services, it was reasonable under the circumstances for Karangekis to do so for law enforcement purposes. Therefore, Karangekis did not violate Defendant's Fourth Amendment rights by entering TWC Auto Body, irrespective of his authority to enter pursuant to the search warrant.

That does not end matters, however. In addition to a lawful basis for his initial intrusion onto TWC Auto Body, Karangekis also needed to possess probable cause to arrest Defendant. The court finds that he did. While Defendant has successfully disputed the alleged *location* of his cocaine transaction with CS, Defendant has not disputed that he actually sold and delivered the illegal narcotics.[10] Moreover, Defendant was recorded by CS discussing the trafficking operation at meetings with Gonzalez, providing some corroboration of the informant's information. Therefore,

---

[9] In addition, unlike the officer in *Long*, Karangekis did not knock before entering TWC Auto Body, supporting the inference that he believed the business was open at the time.

[10] Although, as discussed below, there are no particularized allegations or evidence as to the length of time Defendant has engaged in narcotics distribution.

based on all the information known to law enforcement at the time, Karangekis had the requisite probable cause to believe Defendant "had committed . . . an offense," specifically, cocaine distribution. *Bizier*, 111 F.3d at 217 (quoting *United States v. Cleveland*, 106 F.3d 1056, 1060 (1st Cir. 1997)); *see United States v. Torres-Maldonado*, 14 F.3d 95, 105 (1st Cir. 1994) ("[I]n order to establish that probable cause existed for [a warrantless] arrest, the government need not present the quantum of proof necessary to convict. . . . Rather, it need only show that, at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." (internal quotation marks and citations omitted)). As a result, he was justified in arresting Defendant at that time. *Bizier*, 111 F.3d at 216-17.

Moreover, as the pat frisk occurred approximately ten minutes before Defendant's formal arrest (at which time Defendant was subjected to a more complete search of his person), and probable cause for Defendant's arrest existed prior to both searches, Defendant was permissibly searched incident to arrest. *Id.* at 217. Accordingly, the court will deny Defendant's motion to suppress the fruits of the search of his person.


IV. SEARCH OF DEFENDANT'S RESIDENCE

Defendant also seeks to suppress the fruits of the search of his residence at 21 Walsh Street, Chicopee. As mentioned, this search, like the search of TWC Auto Body addressed in the court's *Franks* ruling, was authorized by a warrant that was supported by the same affidavit drafted by Smith. This raises a question as to what affect, if any, the *Franks* ruling has on the present inquiry. In addition, the government has filed a limited motion for reconsideration as to certain factual findings made by the court in the *Franks* ruling, to the extent those findings are relevant to the search of Defendant's residence. After wading through these issues, the court finds that the affidavit fails to

establish probable cause to search the residence and the good faith exception to the exclusionary rule does not apply.

A.    Relevance of *Franks* Ruling

The government argues that the findings from the *Franks* ruling should not be considered in evaluating probable cause to search the residence because each search was authorized by a separate warrant and the *Franks* hearing was limited to questions relating to TWC Auto Body. The government also seeks, in the event the court considers those findings relevant, reconsideration of the finding that the affidavit's allegation that CS "relayed" he "would obtain kilogram quantities of cocaine" at TWC Auto Body was false.[11] In support, the government asserts that a subsidiary factual finding—"no witnesses testified CS ever stated he had received cocaine at TWC Auto Body," *Roman*, 311 F. Supp. 3d at 436—was erroneous, because the court overlooked Smith's testimony that CS did tell him "he would go to TWC and obtain kilograms from [Defendant]," (Dkt. No. 146, Tr. of Ev. Hr'g November 8, 2017, at 56.)

First, as to the assertion that the *Franks* findings should be disregarded, the court does not agree. As mentioned, the court opted to proceed in a piecemeal fashion—resolving the *Franks* inquiry before addressing the search of the residence—precisely because the *Franks* ruling "necessarily affect[s]" the four-corners analysis as to whether the affidavit established probable cause to search the residence. *Roman*, 2017 WL 4517963, at *1 n.1. Because the government used the same affidavit in support of both search warrants, the alterations to that affidavit required by the court's findings of reckless falsehoods carry over to the present inquiry. Thus, the fact that different warrants authorized the two searches is beside the point, as the same factual allegations in the

---

[11] The government does not seek reconsideration of this finding for purposes of the *Franks* ruling but, rather, only for the issues currently pending before the court, and "only should the Court find the underlying facts relevant" to these remaining issues. (Dkt. No. 181 at 1 n.1.)

affidavit (some of which were found by the court to be false or incomplete) form the basis for the authorization of both warrants. In addition, the searches of the business and residence resulted from the same investigation, and Defendant has challenged those searches in the same motion. As Defendant argues, these issues are inextricably intertwined. Moreover, as a practical matter, the court does not believe it could or should blind itself to its previous findings made in the *Franks* ruling. *Cf. United States v. Whitley*, 249 F.3d 614, 622-24 (7th Cir. 2001) (holding the district court clearly erred based on evidence presented at a separate suppression hearing for a co-defendant revealing false testimony, and rejecting "the government's invitation to consider the officer's credibility regarding the preparation of the [search warrant] affidavit in isolation, divorced from a consideration of their lack of credibility in connection with" the false testimony revealed in the separate hearing).

Second, as to the motion for reconsideration, that motion will be denied. As the government itself acknowledges, the disputed finding regarding CS stating that he "would obtain kilogram quantities of cocaine" at TWC Auto Body is not particularly relevant to the search of the residence, because the present inquiry is focused on the connection between criminal activity and Defendant's residence, not his business. On the other hand, this allegation—if not stricken from the affidavit— arguably supports the inference that Defendant was an established or long-time drug dealer, a factor (discussed below) which potentially does bear on whether evidence of criminal activity is likely to be found at the residence.

In any event, the court is not persuaded that it should alter its ultimate finding based on the evidence cited by the government. The government is correct that Smith did testify, contrary to the court's findings, that CS stated "he would go to TWC and obtain kilograms from [Defendant]." (Dkt. No. 146 at 56.) However, as the court noted in its *Franks* ruling and the government does not dispute, "[n]o DEA reports indicate that CS made [this] statement." *Roman*, 311 F. Supp. 3d at 436.

Smith's one statement—which he arguably subsequently contradicted[12]—over the course of three days of testimony from three government agents is insufficient in the face of all the other evidence indicating that this key sentence in the affidavit has little to no reliable basis in fact. Moreover, Smith's testimony that CS stated "he would go to TWC and obtain kilograms from [Defendant]," (Dkt. No. 146 at 56), is exceedingly vague; it provides no details, such as a time range, from which the court can assess the reliability of this assertion. *Cf. Roman*, 2017 WL 4517963, at *3 ("[T]he bare assertion that [CS] 'would obtain' drugs from Defendant's business, without any additional detail or factual support, strikes the court as the type of conclusory or generalized statement which fails to provide 'a substantial basis for determining the existence of probable cause.'" (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983))). Ultimately, the court finds, the testimony cited by the government in its motion for reconsideration is simply not sufficient to substantiate the affidavit's assertions that CS obtained drugs at TWC Auto Body or was an established drug dealer.

Having resolved these preliminary matters, the court next describes the relevant allegations in the affidavit, as reformed in conformance with the *Franks* findings, before analyzing whether the affidavit establishes probable cause to search the residence.

---

[12] The court notes that the transcript is ambiguous, at best, as to whether Smith subsequently offered conflicting testimony. On January 3, 2018, the following colloquy between defense counsel and Smith occurred:

Q:    Now in this case you said that when you authored the affidavit you didn't have memory, or you don't have a memory now, as to whether the information that you included *in the paragraph that's in issue* came to you via the informant, another agent, or what the source was, correct?

A:    Correct.

(Dkt. No. 181-1, Tr. of Ev. Hr'g Jan. 3, 2018 at 8 (emphasis added.) The government asserts that the italicized language referred only to the portion of paragraph 54 which discusses "the three kilograms which were seized from CS in January of 2014," and not the entirety of the sentence, which states: "As previously stated, [CS] relayed that [TWC Auto Body] is the location where he would obtain kilogram quantities of cocaine from the Gonzalez Organization to include the three kilograms which were seized from [CS] in January of 2014." (Dkt. No. 131-1 ¶ 54.)

B.  Reformed Affidavit

The affidavit submitted in support of the application for the warrant to search Defendant's residence (among other locations) mainly focused on Gonzalez and his transportation of large quantities of drugs from Texas to Massachusetts using hidden compartments in automobiles. (Dkt. No. 131-1.) The affidavit alleged the following information particular to Defendant. After law enforcement seized the three kilograms of cocaine from CS, he agreed to cooperate and stated that he obtained the drugs from Defendant "on behalf of Gonzalez." (*Id.* ¶¶ 15-16.) CS explained that Defendant "is a close criminal associate of Gonzalez and oversees distribution of the narcotics for" him. (*Id.* ¶ 16(a).) CS recorded a handful of conversations with Gonzalez and Defendant, during which CS told them the three kilograms had been stolen during a robbery and they discussed the quality of certain hidden compartments. (*Id.* ¶ 17, 18, 20, 28, 36.) During one meeting, "while discussing [CS's] safety during drug transactions, [Defendant] showed [CS] a firearm . . . in his possession." (*Id.* ¶ 18.) During another meeting, Defendant "relayed that the trapped vehicles were currently in the garage of Cano Used Tires, which is immediately adjacent to and accessible from JGL Truck Sales," Gonzalez's business. (*Id.* ¶ 37.) Defendant also indicated at this meeting that he may "shut down for a while and cool off." (*Id.*) And at another meeting, Defendant indicated that he did not then have any supply of drugs.[13] (*Id.* ¶ 38.)

The following information has been altered or removed from the affidavit as a result of the *Franks* ruling. As submitted, the affidavit stated CS obtained the kilograms of cocaine later seized by law enforcement at TWC Auto Body. However, in light of the *Franks* hearing, the reformed affidavit now asserts that this transaction occurred at CS's business address in Springfield. That same

---

[13] Although the affidavit quotes Defendant as stating they were currently "dry," which Smith asserted in the affidavit was a term used "to mean that they do not currently have a supply of drug," (*id.* ¶ 38), it was revealed at the *Franks* hearing that Defendant actually stated "there is nothing around brother, nothing." *Roman*, 311 F. Supp. 3d at 433. Smith testified at the *Franks* hearing, however, that Defendant's actual statement during the meeting had the same meaning as ascribed in the affidavit.

sentence in the affidavit also originally asserted that CS "would obtain kilogram quantities of cocaine" at TWC Auto Body, and another paragraph stated CS was "a known cocaine trafficker." Both of these statements, as discussed in the preceding section, have been removed from the reformed affidavit for lack of evidentiary support.[14]

C.    Analysis

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called 'nexus' element." *United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015) (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999)). Although, as explained above, the government had probable cause to believe that Defendant committed a crime, the affidavit does not establish probable cause vis-à-vis the nexus element. *See United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) ("[P]robable cause to arrest does not automatically provide probable cause to search the arrestee's home." (collecting cases)); *see also United States v. Thompson*, 630 F. Supp. 2d 138, 143 (D. Mass. 2009). As was true for TWC Auto Body, the reformed affidavit's allegations "do not create a sufficient link between the criminal activity and Defendant's [residence]." *Roman*, 311 F. Supp. 3d at 439 (quoting *Roman*, 2017 WL 4517963, at *3). "The critical element in a reasonable search," the Supreme Court has explained, "is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547,

---

[14] The court notes that even if the *Franks* ruling had no spillover to the present inquiry, it would still disregard these two allegations in the affidavit. As noted, the court explained in its first decision: "[T]he bare assertion that [CS] 'would obtain' drugs from Defendant's business, without any additional detail or factual support," is too "conclusory or generalized . . . to provide 'a substantial basis for determining the existence of probable cause.'" *Roman*, 2017 WL 4517963, at *3, (quoting *Gates*, 462 U.S. at 239); *see Gates*, 462 U.S. at 239 ("[A] mere conclusory statement . . . gives the magistrate virtually no basis at all for making a judgment regarding probable cause. Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."); *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999) (holding that "the conclusory statements of the affiant that might otherwise have helped create probable cause are entirely without factual support" and, thus, the affidavit was insufficient).

556 (1978). And "[w]hat is missing here is 'any factual basis which would indicate that contraband or evidence of alleged criminal behavior would be found at the . . . address." *Roman*, 2017 WL 4517963, at *3 (quoting *United States v. Rosario*, 918 F. Supp. 524, 530 (D.R.I. 1996)).

The court continues to believe that "a suspect's status as a drug dealer, standing along, [does not] give[] rise to a fair probability that drugs will be found in his home." *Id.* (quoting *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016)).[15] "Instead," this court has explained, "there must be 'some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence; that is, [the court] require[s] facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Id.* (quoting *Brown*, 828 F.3d at 383); *see also Brown*, 828 F.3d at 384 ("[I]f the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer.").

The government contends that there are sufficient "plus factors" supporting the nexus element, such as Defendant's "long-time" history of drug dealing. (Dkt. No. 187 at 6, 8.) But there are absolutely no allegations in the reformed affidavit, nor was there any evidence proffered at the *Franks* hearing, indicating the length of time Defendant has been engaged in drug trafficking.[16] Accordingly, the facts here "are a far cry" from those in the affidavit in *Feliz*, 182 F.3d at 87-88,

---

[15] The government continues to cite the original, vacated decision in *United States v. Brown*, 801 F.3d 679 (6th Cir. 2015), as it has throughout its briefing of this motion, for the proposition that a suspect's status as a drug dealer, without any additional connection to the residence, is enough to support the warrant application's nexus requirement. *See id.* at 688. As the government must be aware, however, the Sixth Circuit's decision in *Brown* was subsequently amended and superseded in *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016). In the subsequent decision, the Sixth Circuit specifically rejected that proposition asserted in the vacated decision and relied upon by the government here. *See id.* at 683.

[16] The reformed affidavit alleges "*Gonzalez* has been making [his] trips [to Texas to purchase drugs] approximately every three months over the past 7-8 years," but it is silent as to how long Defendant has been involved. (Dkt. No. 131-1 ¶ 16(e) (emphasis added).)

where the First Circuit held that evidence of a suspect's status as "a long-time, successful, drug trafficker" may permit the inference that he is likely to keep drugs and business records in his residence. *Roman*, 311 F. Supp. 3d at 440. In *Feliz*, unlike here, the First Circuit noted "the affidavit contained substantial, detailed information indicating that Feliz had engaged in illegal drug trafficking for at least twelve years, most recently in the Portland area." *Feliz*, 182 F.3d at 87. Moreover, in contrast to most First Circuit decisions identifying a sufficient nexus, no information suggested Defendant dealt drugs from his residence, or was observed leaving or returning to it in connection with drug transactions.[17] *Compare United States v. Hicks*, 575 F.3d 130, 137 (1st Cir. 2009); *United States v. Dessesaure*, 429 F.3d 359, 368-69 (1st Cir. 2005); *United States v. Ribeiro*, 397 F.3d 43, 45–46, 49–51 (1st Cir. 2005).

Moreover, as noted in the *Franks* ruling, "Smith's affidavit alleges Defendant dealt drugs on behalf of Gonzalez, who clearly occupied the main focus of the affidavit." *Roman*, 311 F. Supp. 3d at 440. And the affidavit specifically alleges that the vehicles, used to conceal the cash and drugs, were stored near Gonzalez's business. (Dkt. No. 131-1 ¶¶ 16, 37.) "Therefore, any inference that could permissibly be drawn from [Defendant's] status as a drug dealer regarding the location of evidence is significantly weakened where, as here, it is more likely that such evidence would be found at the residence or business of another individual," namely, Gonzalez. *Id.* (citing *Feliz*, 182 F.3d at 88).

The government also relies on Smith's opinion in the affidavit "that it is generally a common practice for drug traffickers to store their drug inventory, drug related paraphernalia, and drug related records [as well as proceeds and purchases] . . . . in their residences." (Dkt. No. 131-1 ¶¶ 44-45; *see also id.* ¶ 46-48, 50.) As the court has explained, however, the force and weight of this assertion is significantly compromised "in light of the reasons to doubt affiant's credibility and

---

[17] Defendant, it should be noted, also contends the affidavit fails to sufficiently connect him to 21 Walsh Street. The court need not address this argument, as it finds the affidavit fails to establish probable cause for the reasons set forth.

accuracy under the circumstances of this case," *Roman*, 311 F. Supp. 3d at 440 n.12, including the fact that Smith falsely represented the information contained within the affidavit was based on his "personal knowledge or knowledge that could be meaningfully attributed to, or considered as shared by, other officers," *id.* at 437 n.11. In addition, this type of opinion evidence is insufficient, on its own, to satisfy the nexus element. "To permit a search warrant based solely upon the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect." *Rosario*, 918 F. Supp. at 531; *see also Ribeiro*, 397 F.3d at 50-51.

Lastly, the government contends the magistrate's probable cause determination is entitled to deference and, relatedly, the good faith exception applies here in the event probable cause is lacking. Although normally "a search warrant is reviewed with deference to the issuing magistrate, . . . allegations of reckless omission [or misrepresentation] implicate the very truthfulness, not just the sufficiency, of a warrant application." *Roman*, (quoting *United States v. Gifford*, 727 F.3d 92, 99 (1st Cir. 2013). "Therefore, if such allegations prove to be true, [the court] owe[s] no deference to a magistrate's decision because 'no magistrate will have made a prior probable cause determination based on the correct version of the material facts." *Gifford*, 727 F.3d at 99 (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 82 (1st. Cir. 2005)); *see also United States v. Leon*, 468 U.S. 897, 914 (1984). This exception to the usual deference applies here, where the same search warrant affidavit was found to contain reckless misrepresentations and omissions in the *Franks* context.

The court also concludes that the good faith exception to the exclusionary rule does not apply here. Contrary to the government's assertion, this case directly fits the Supreme Court's admonition in *Leon* that "[s]uppression . . . remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S at 923; *see*

*also id.* at 926 ("[S]uppression is appropriate . . . if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.").[18] There is no indication in *Leon* (or elsewhere, as far as the court can tell) that the misrepresentation or omission precluding good faith must be critical to the deficiency at issue, here, the lack of probable cause to search the residence. *See, e.g., United States v.* Abernathy, 843 F.3d 243, 258 (6th Cir. 2016). Rather, the Supreme Court grounded the good faith exception in the underlying purpose of the exclusionary rule—deterrence of police misconduct. *See Leon*, 458 U.S. at 918-19; *see also Davis v. United States*, 564 U.S. 229, 238 (2011) ("The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue. . . . When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." (quoting *Herring v. United States*, 555 U.S. 135, 143-144 (2009))). Here, the officers exhibited reckless disregard for the truth in preparing the affidavit supporting the search warrant. The value of deterring such behavior outweighs the cost of excluding the evidence unearthed as a result of that search. *See United States v. Vigeant*, 176 F.3d 565, 572 (1st Cir 1999); *United States v. Fuccillo*, 808 F.2d 173, 178 (1st Cir. 1987).

Accordingly, because the reformed affidavit fails to provide probable cause to search the residence and the good faith exception is not available, the fruits of this search will be suppressed.

## V. CONCLUSION

For the foregoing reasons, the court ALLOWS Defendant's Motion to Suppress (Dkt. No. 126) in part, to the extent it seeks suppression of the fruits of the search of his residence, 21 Walsh

---

[18] The reformed affidavit also arguably constitutes a "bare bones" affidavit as to Defendant, another situation in which *Leon* explains good faith does not apply. *See id.* at 915, 923; *see also United States v. Stearn*, 527 F.3d 540, 562 (3d Cir. 2010) ("Of course, where multiple warrants are supported by a single affidavit, an otherwise detailed affidavit may nevertheless be 'bare bones' with respect to some of the warrants sought.").

Street, Chicopee, Massachusetts; but the court DENIES Defendant's motion to the extent it seeks suppression of the fruits of the search of his person.

/s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge